## George T. Davis v. The Detroit and Milwaukee Rail Road Company.

*Evidence: Presumption in favor of railroad companies in actions for injuries to employees: Reputation of unfitness of employee who caused the injury: Burden of proof: Special directions.* In a suit brought by a railroad employee against the company for damages caused by the alleged unskillfulness or negligence of another employee of the same company, the defendants are entitled to the benefit of the presumption that they exercised due care in the employment of the person charged with unskillfulness, or negligence, and that they had no knowledge of the defects of capacity or character imputed.

General reputation of unfitness would be admissible as evidence, and might be sufficient to charge the company with knowledge, notwithstanding they may have been actually ignorant of it. The ignorance will be negligence in a case, in which any proper inquiry would have obtained the necessary information, and where the duty to enquire was plainly imperative. But the burden of proof to establish the unfitness alleged as the ground of the plaintiff's action, and the defendant's knowledge of it, is upon the plaintiff.

*Railroad companies and their employees: Liabilities and duties inter sese.* A railroad employee having knowledge of the unfitness of another employee of the same company, or one whose position or duties are such that he ought to be acquainted with such unfitness, when it had become notorious; and who does not give information to the company of the unfitness thus actually or constructively known to him, takes upon himself all the risks of injury from such unfitness, while engaged in the ordinary performance of his duties, as much as if he had expressly contracted with reference to possible injuries from that cause.

Where the reasons, which are relied upon to charge the officers of the company with knowledge, apply with equal force to show the knowledge of the plaintiff, the negligence of the latter in not complaining is as great as that of the company in employing an incompetent person; and where employer and employee have equal knowledge, and the latter continues the service, each party

takes the risk unless the employer undertakes to give special directions. A direction by a railroad officer to his subordinate to perform an ordinary service such as his employment contemplated, there being nothing unusual in the mode directed, is not such a special direction as will charge the company for an injury happening during the performance of such service.

It is a neglect of duty in a railroad employee not to give notice to the proper officers of the company of any fact, affecting the performance of the duties of the company to the public, occurring within the department under his supervision.

*Evidence: Plaintiff as witness: Charge of the Court.* When the plaintiff, on the stand as a witness, states his case so as to show that he has no cause of action, and there is no attempt at a qualifying explanation by other witnesses, he has no ground of complaint, if the Court charge the jury that no recovery is justifiable,

*Heard January 8.    Decided April 5.*

Error to Wayne Circuit.

This was an action on the case brought by George T. Davis against the Detroit and Milwaukee Railroad Company, for injuries received by him while in the employ of the defendants as " head yardsman " at Detroit, alleged to be occasioned by the incompetency and carelessness of one Joseph Harris, an engine driver, also in the employ of defendants, and whose business it was to run a " pony engine" used for training cars, at the depot in Detroit.

The declaration contains three counts; each averring that the injury to the plaintiff was occasioned by the incompetency and carelessness of Harris. The *first* count avers that the defendants wrongfully and negligently employed Harris, well knowing that he was reckless and incompetent; and that the service in which he was engaged at the time of the injury was in obedience to a special order from the freight agent and depot master. The *second* avers that the incapacity of Harris became known to the defendants after his employment and before the injury, yet they retained him in their service after such knowledge; and the *third* avers that the defendants employed Harris without proper care and diligence.

The cause was tried by a jury, who, under the charge of the Court, found a verdict for the defendants. The questions to be reviewed in this Court arise upon the exceptions

to the charge to the jury. Two requests were presented by the plaintiff, the second of which the Judge refused to give and the plaintiff excepted. Six were asked by the defendants which were given; to the third, fourth, fifth and sixth, of which the plaintiff excepted. The request of the plaintiff which was refused is as follows:

2. If the jury find that there is evidence tending to show that the reputation of Harris was bad as an engineer, then this was notice to defendant.

The requests presented by the defendants and charged by the Court, to which the plaintiff excepted are as follow:

3. That there is no evidence in this case to show want of care or good faith on the part of the company, in the selection of Harris for his position.

4. That, if it is claimed that Harris, fell into habitual carelessness after he was employed, there is no evidence that knowledge of such fact was brought home to the officers of the company, or that the company continued him in employment after such knowledge.

5. That, as the plaintiff testifies that Harris was working with the plaintiff, and under his general direction as head yardsman, from July 16th to November 22d, this gave the plaintiff full opportunity to know if Harris were habitually careless; and, as plaintiff testified that he made no complaint whatever to the officers of the company, the plaintiff cannot recover in this case.

6. That there is no evidence in the case to show that the casual remarks made by unknown persons, testified to by Lewis and Sullivan, ever reached the knowledge of any officer of the company, and this evidence is to be excluded from the case.

In giving the fourth instruction as requested by the defendant's counsel, the Court said to the jury: "I am not aware of any evidence except as to reputation, and I don't think that there was reputation shown sufficient to bring it to the knowledge of the company. If Harris had a re-

putation of being careless, which was universally talked of, then, perhaps the company might be bound to know that reputation, without actual notice to the officers being shown. I am not aware of any evidence in this case of that nature which would be notice to the company, and I, therefore, charge you as requested."

And in reference to the fifth instruction asked by the defendant's counsel, the Court said to the jury: "That, gentlemen, of course, goes to the whole case, and I feel compelled, from the testimony, to charge you as requested. That is, simply, that if you believe that the plaintiff knew that Harris was careless, or worked with him knowing he was careless, he took the chances. Davis himself has testified that he worked with him, and that he had the general control, being head yardsman; and, also, that he never made any complaint; and I, therefore, charge you that he cannot recover."

*Wm. Jennison and A. D. Fraser*, for plaintiff in error.

I. The Court erred in giving the 3d, 4th, 5th, and 6th requests of defendant with the modifications and qualifications of the 4th and 5th. The effect of these charges was to instruct the jury: 1. That there was *no evidence* to show a want of proper care on the part of the company in selecting Harris the engineer. 2. That there was *no evidence* that the defendant had any subsequent knowledge of his incompetency and recklessness. 3. That plaintiff knew of Harris' incompetency, and therefore he could not recover. The Court thus took the evidence away from the jury, and directed them to find for the defendant.

The action cannot be sustained without proof of negligence. Whether it be proven or not, is for the determination of the jury, and to whom it must be submitted. Whether there be evidence, it is for the Court. Whether it is sufficient, is for the jury.

DAVIS v. THE DETROIT AND MILWAUKEE RAIL ROAD COMPANY.

The character of Harris' acts, through the earlier period of his employment to the day of his dismissal, is sufficient to raise a presumption of his incompetency when first employed, and hence a want of care in selecting him.

The testimony of John Sullivan is positive as to the reputation of Harris, and that too as it was understood in the yard of defendant—the very place where it would be best known; and the best judges would be the employees.

This reputation was notice of some sort, and the jury were entitled to consider it.    See *38 Penn. St., p. 104*, as to this point.

There was surely *some evidence* touching the question of negligence, and it was for the jury to say what its value was.    The following authorities illustrate the mutual duties of Court and jury:—*Wisner v. Davenport, 5 Mich. 501; Brooks v. G. T. R. R. Co. 15 Id., 332; D. & M. R. R. Co. v. Steinburgh, 17 Id., 99.*—Whether the defendant or its agents were guilty of the negligence, was purely a question of fact and exclusively for the consideration of the jury.—*Hall v. City of Lowell, 10 Cushing, 260; Galena &c. R. R. Co. v. Yarwood, 17 Ill., 509.*—An instruction which has the effect to withdraw from the jury, any matter of fact which is open on the evidence, is erroneous.—*Jewell's Lessee v. Jewell, 1 How., 219.*

To deduce facts from the evidence is the province of the jury.    It is for them to weigh facts and circumstances.—*Brewer v. Orser, 2 Bosw. (N. Y.,) 365; Clarke v. Calif. S. N. Co., 9 Calif., 251; Sawyer v. Nicholas, 40 Maine, 212; Frazer v. Griffie, 8 Maryland, 50; Metropolis v. Guttschlich, 14 Peters, 19; Greenlf. v. Birth, 9 Peters, 292; Athens v. State, 16 Ark., 568*—It is error for the Court to instruct a jury that a part of the evidence in the cause does not warrant them in finding the negligence imputed, proved or otherwise.    It shall be left for the jury on the whole evidence to draw their own inference.—*Smith v. Coudry, 1 Howard, 28.*

If there be any evidence tending to establish a fact in issue, it must be submitted to the jury.—*Tison v. Yawn, 15 Geo., 491; Richardson v. Boston, 19 Howard, 263; Crofts v. Waterhouse, 11 E. C. N. 119; Graham on New Trials, 262, 266, 310, 312, 313, 314, 316 and 361; Brightley's Dig., 511; Curtis' Dig., 303.*

II. It is claimed by the defense that were all the facts claimed by plaintiff true, the plaintiff cannot recover, because he remained in defendant's employment after he knew of the alleged incompetency of Harris. The charge of the Court ( No. 5 ) assumes this fact to be true, and thereupon he directs the jury to find for the defendant. They were not even permitted to look at the evidence. If this be not error, then the vocation of the jury is gone.

But Mr. Malden, who had charge of the freight department, expressly directed the plaintiff to go and do the very thing which he attempted to do, viz: to take the freight car in question by means of the pony engine, to a certain point. He was bound to obey his superior officer.— See especially *3 Duer, p. 360.*—And this would seem to take the case out of the rule, relieving corporations from liability for injuries committed by one fellow laborer upon another. —*Sherman & Redfield on Negligence, pp. 115 and 116, and note.*—A servant's knowledge of his master's habits of employing incompetent servants will not affect his right to recover.—*Ibid. p. 114.*

*Geo. V. N. Lothrop,* for defendant in error.

As to the errors alleged in the charge of the court:

1. The Court declined the second request of the plaintiff. This was framed with reference to what was called "reputation" in the plaintiff's evidence. And the effect of the request was that if the jury found there was such a reputation, this was *constructive* notice to the defendant.

DAVIS *v.* THE DETROIT AND MILWAUKEE RAIL ROAD COMPANY.

The prayer ignores all idea of *general* character or reputation.

2. It is now fully settled that the master is not liable to those in his employment for injuries arising entirely from the negligence, misconduct or unskillfulness of fellow servants. Nor does it make any difference that they are in different grades or departments of employment, so that they are engaged in the same general business. The cases now are too numerous to cite fully. The doctrine is treated as settled in *Leahey v. M. C. R. R. 10 Mich., 199 ; 1 Redf. on R. R. p. 520 ( 3d Ed.) ; Priestly v. Fowler, 3 Mees. and W., 1 ; Abraham v. Reynolds, 5 H. and Nov., 142 ; Searle v. Lindsey, 11 C. B. ( N. S. ), 429 ; Morgan v. Vale of Neath R. R., 1 L. R. Q. B., 154 ; Feltham v. England, 2 L. R. Q. B., 33 ; Tunney v. R. R. Co., 1 L. R. C. B. 289 ; Farwell v. B. & W. R. R. Co., 4 Met., 49 ; Hayes v. West R. R. Co., 3 Cush., 270 ; Gilshamon v. Stony Brook R. R., 10 Cush., 228 ; Gilman v. E. R. R. Co., 10 Allen, 233 ; Albro v. Agawam . Canal Co., 6 Cush., 75 ; Brown v. Maxwell, 6 Hill, 592 ; Coon v. S. & N. R. R. Co.. 5 N. Y., 492 ; Sherman v. R. & S. R. R. Co., 17 N. Y., 153 ; Boldt v. N. Y. Cent. R. R. Co., 18 N. Y. 432 ; Wright v. N. Y. C. R., 25 N. Y.. 564 ; Warner v. Erie R. R. Co., 39 N. Y., 470 ; Carle v. B. & P. R. R. Co., 43 Me., 269 ; Beaulieu v. Portland Co., 48 Me.. 294 ; Ryan v. C. V. R. R. Co., 23 Pa., 384 ; Caldwell v. Brown, 53 Penn., 457 ; Weger v. Penn. R. R. Co., 55 Penn., 460 ; Harrison v. Cent. R. R., 31 N. J., 293 ; Thayer v. St. L. R. R. Co., 22 Ind. 26; Hard v. V. & C. R. R., 32 Vt., 473 ; Hayden v. S. Manuf. Co., 29 Conn., 548 O' Connell v. Balt., R. R., 20 Md., 212 ; Sullivan v. M. & M. R. R., 11 Iowa, 426.*

And even Ohio, Indiana, and Wisconsin, where there was an inclination once to establish a different doctrine, the Courts now nearly, if not entirely, conform to the law as above stated.— *Compare L. M. R. R. Co. v. Stevens, 20 Ohio, 415 ; P., Ft. W. & C. R. R. Co. v. Devinney, 17 Ohio*

*St.*, 209 ; *Gillenwater v. M. R. R. R. Co.*, 5 *Ind.*, 341; *Fitzpatrick v. S. & N. Alb. R. R. Co.*, 7 *Ind.*, 436; *O. & M. R. R. Co. v. Tindall*, 13 *Ind.*, 366 ; *Thayer v. St. L. R. R. Co.*, 22 *Ind.*, 26 ; *Chamberlain v. M. & M. R. R. Co.*, 11 *Wis.* ; *Mosely v. Chamberlain*, 18 *Wis.*, 700.

These with many other cases established beyond question the doctrine that when the fault lies entirely between fellow servants, the master is not liable ; and that he is only liable when some fault contributing to the injury attached directly to himself.

3. These cases support the defendant's *second* request, which merely presents the proposition that, in respect to Harris, the plaintiff must show that the company was at fault, either in originally employing him, or in retaining him afterward.

4. The Court charged that there was no proof that there was any want of care or good faith in the employment of Harris. This, I think, cannot be controverted. Not one word of evidence was offered or sought to be offered by plaintiff on this point. And, of course, if plaintiff set up such want of care, etc., he was obliged to give some evidence of it. The burden was on him, and he was required to give affirmative proof.—*2 Redfield on R. R.*, 200, § 15 ; *McM. v. S. R. R. Co.*, 20 *Barb.*, 442 ; *Faulkner v. E. R. R. Co.*, 49 *Barb.*, 326 ; *Kurtz v. Stuart*, 1 *Daly* 432 ; *Hayden v. S. Manuf. Co.*, 29 *Conn.*, 557 ; *M. R. & L. E. R. R. Co. v. Barber*, 5 *Ohio St.*, 568 ; *Ind. & C. R. R. Co. v. Love*, 10 *Ind.*, 554 ; *Gilman v. E. R. R. Co.*, 10 *Allen*, 233 ; *Beaulieu v. Portland Co.*, 48 *Me.*, 294 ; *Thayer v. St. L. R. R. Co.*, 22 *Ind.*, 26 ; *M. & O. R. R. Co. v. Thomas*, *Law Register*, March, 1869, *p. 154.*

5. The *fourth* and *sixth* requests of the defendant may be considered together. It was attempted to show that Harris became habitually careless, so that he acquired a reputation of this kind in the yard. Lewis and Sullivan

testified to hearing such talk among laborers whom they could not name.

Now, there was not only no evidence that this talk ever reached any officer of the company, but all the evidence was the other way. Still further the plaintiff, Lewis, and Sullivan, each testified that no complaint was ever made to any officer of the company. The Court was therefore bound to tell the jury that there was no evidence that the alleged yard talk reached the company, and that there was no evidence that knowledge of the alleged habitual carelessness of Harris was brought home to the officers of the company. In explaining this point, the Court said that it was possible that a reputation might be so general as to affect the company, and warrant the jury in finding that it reached the company without proof of actual notice, but that nothing of that kind appeared in this case. This was at least as favorable a view as the plaintiff could claim.

6. But the case was finally disposed of by the fifth instruction. The Court told the jury that as Harris worked directly under the plaintiff during the whole time he was there, from July 16 to November 22, giving the plaintiff full opportunity to know whether Harris was careless; and as he himself said he never made any complaint to the officers of the company, he could not recover.

It is held over and over that where the servant injured through the carelessness or incompetency of a fellow servant, or through any defective machinery furnished, had the same knowledge or means of knowledge as the master, he cannot sustain any action for the injury.—*1 Redfield R. R. p. 521, note; Ship v. E. Co. R. R. Co., 9 Exchq., 221; Williams v. Clough, 3 H. & Nor., 258; Assop v. Yates, 2 H. and Nor., 768; Griffiths v. Gidlow, 3 H. and Nor., 653; Seymour v. Muddox, 16 Q. B., 326; Patterson v. Wallace, 28 Eng., L. and Eq., 491; Dynen v. Leach, 40 Eng. L. and Eq. R. 491; Miller v. S. & W. R. R. Co., 20 Barb., 449; Wright v. N. Y. C. R. R. Co., 25 N. Y. 566; Hayden v. S. Mfg. Co., 29*

*Conn. 559 ; Frazier v. R. R. Co., 38 Penn., 104; Potts v. Plunkett, 7 Am. Law Reg., p. 555; M. R. & L. E. R. R. Co. v. Barber, 5 Ohio St. R., 563–5.*

In this case, not only did the plaintiff have equal means, but he had better means than any one else. The delinquent was his subordinate, working under his eye and under his general direction. If he was careless, it was his duty to admonish him, and if the fault was not corrected to make his fault known to the proper department. To fail to do so is to be most culpable on his own part. By his own fault he exposes the safety of others, and exposes the company to risk and liability. If, then, through a fault to which he had become a party, he himself suffers damage, how can he be heard to complain ? The cases cited above cover the case fully. They decide that in such cases the fault of the plaintiff contributes directly to the injury. This is held in cases where the plaintiff was either the subordinate of the negligent servant, or even in no way connected with him except as engaged in the same general service.

But in this case the plaintiff was head–yardsman. If Harris, who was under him, had become negligent, it was his fault that this was suffered to go without complaint. And therefore, as between plaintiff and defendant, the former is chargeable with the sole fault in the matter.

COOLEY, J.

This action appears to have been brought by Davis to recover damages of the defendants for an injury, sustained by him while in their employ, in consequence of the negligence of one Harris, one of their engineers. It does not appear either from the declaration or from the brief on behalf of the plaintiff in this Court, that he contests the general principle which was recognized in *Leahy v. the Mich. Cen. R. R. Co., 10 Mich., 199,* that the employer is not liable to

those in his employment for injuries arising from the neg-
ligence, misconduct or unskillfulness of fellow servants, where
the employer himself is not in fault, but he seeks to bring
this case within an exception to that rule by showing,
either that Harris was incompetent and an unfit man to
be employed by the defendants in the capacity of engineer
and that they were guilty of negligence in employing him,
or that he was untrustworthy, careless, imprudent and reck-
less previous to, and at the time of the accident, and that
the defendants with notice of that fact continued him in
their employ.

The principle evidence in the case was given by the
plaintiff himself; and as the charges of the Court to a con-
siderable extent were based upon it, it seems important to
give a very full statement of it. The material portion is as
follows:

"I entered the employ of the defendants, July 16, 1867.
My position was head yardsman at Detroit; the yard of
defendants extending from Hastings to Brush street, and
from Atwater street to the river. My duties as yardsman
were these: When trains came in, the conductor brought
the way bills to me. I check off the bills to see that every
car has a proper bill, and mark the cars with chalk where
they are to go, and see that they are put on the proper
tracks for the freight agent or the public to take their
goods; also to see that the cars are properly put away,
and that the under yardsmen did not neglect their duty:
to keep the time of the men at work in the yard; to
see that they were at work in time, and to report to Mr.
Malden, my superior, anything that went wrong in my de-
partment. I gave satisfaction, and after two months I asked
for and the company increased my pay, with the understand-
ing that I would take the whole charge of the whole yard,
and assist all I could, and push things to the best of my
ability, and I accepted on those terms. If cars came in

without any way-bill, I reported the fact to Mr. Malden, and followed his instructions.

"The company had two pony engines by day and another for the night at work in the yard training cars. On November 22, 1867, a through freight car came in with the morning train without a way bill, but marked on the outside "Loco. Shop Car," and I reported the fact to Mr. Malden, freight agent and station master of the defendants at Detroit, and as such, my superior officer to whom I was to report. Mr. Malden told me I had better take the car down to the locomotive shop and see if its freight belonged to Mr. Briscoe's department, and if it did not to bring it right back to the freight house so that it should not get astray. He told me to go with it. The usual way of taking a car was by an engine, and the distance that it was to be taken was about one half mile. In taking it, I was allowed to do as I pleased, and to take the best opportunity, keeping out of the way of incoming trains. I went to look for the pony engine and found it at Hastings street, and told the engine man that we wanted to take a car to the locomotive shop. The car tracks in the yard are numbered. The car which I wanted to get was on track seven, but the cars that the engine ran into were on track six, and Hastings street is about twenty car lengths from the point of collision, or from two hundred to three hundred yards, and in going that distance we had to cross one track and two switches.

"When the pony engine started, there was on it the engine driver, the fireman, myself, John Sullivan a yardsman, and William Lewis stood on the steps, five in all. As soon as Harris, the engineer, put on steam, the engine made a leap. The small engines take steam quick and leap all at once. He put on full steam and rushed back; going backwards he ran recklessly with great speed slap right into a car—going, I think, in forty seconds, and at a speed of eight miles or more. I had told Harris the car we wanted was on track seven, and we could see it when we got about

half way. This was about eleven o'clock, A. M., and a good day; the track was not slippery; I think he could pull up in a minute. The switch was set for track six, and Harris rushed with lightning speed past the switch, not making any effort to stop, not giving the switchman any chance to shift it, and rushed right into a car on track six. Harris was familiar with the tracks and switches; there were about eleven cars on track six, part loaded with wheat and part with lumber; we struck a lumber car. I stood looking the way we were going, and don't know whether Harris reversed his engine, or tried to do so, before we struck. No one but Lewis jumped off before we struck. These engines have no tender, but carry their wood in an iron rack. I was standing between this and the boiler. Sullivan was standing in the gangway and the fireman in his place. I was standing in the safest place. The engine was wedged under the end of the lumber car by the collision, and a piece of wood was driven against my shin, making a hole into it and smashing my leg." And after some further evidence describing the injury and subsequent events, and showing that the public offices of the defendant company were situated within said railroad yard; the plaintiff on cross examination proceeded to say:

" I was head yardsman; Sullivan and Wilson were under yardsmen, the same Sullivan that was on the engine with me. Harris had been an engine driver of one of the pony engines during the whole of the time I had been there; it was my constant business during this time to use his engine when training cars when he was on duty. He was one week working at night, and one week during the day; there were two engines in the yard, and he used either the one or the other. I had occasion to use Harris and his engine when training cars. I constantly used him and his engine in training cars. On the occasion in question my under yardsmen went down with me to couple on the cars. Each under yardsman is connected with an engine,

which he follows wherever it goes; I sometimes use one engine and sometimes the other. The under yardsmen always keep with their own engine; I leave them and go to the office for oils. Sullivan was attached to the engine of which Harris was the engineer. I am sure the car I was going after stood upon track number seven. It was always my practice when going from one part of the yard to another, any distance, to ride upon the yard engine when it happened to go in the same direction. Lewis dropped off the pony engine ten or fifteen feet, or perhaps five, before it struck. Nothing at all was said on the engine by any one about changing any switch. I had said nothing to Harris about the speed at which he was running, nor do I know that anything was said by anybody. After we passed the switch, nothing was said about being on the wrong track. There was no time to say anything."

On re-examination he said: "I am competent to state at what speed an engine is run. These pony engines ought not to be allowed to run exceeding five miles an hour in the yard at all, and at this speed the switchman would not be able to get off the engine and arrange the switch, unless the engine slacked. On this occasion the engine should have slacked so that the switchman could have jumped off in time to run ahead and throw the switch over. I think he should have slacked up about forty feet before he came to the switch, and brought his engine entirely under his control, so as to be able to stop in case the switch should not be thrown over, as switches sometimes catch and do not work readily. The switch rails are about twenty-four feet long. As we were on a curve there, I think had Harris shut off the steam, he could have stopped forty feet from the switch, in time for the switchman to run ahead and turn it. I do not think he shut off steam at all."

On re-cross examination he testified that he was baggage master in Buffalo, on the Buffalo and Lake Huron Road,

and had control of the working of the yard there in 1860." Was also car stopper and superintendent of the baggage department at Stratford Junction. Have worked an engine occasionally for my own amusement so as to know how to do it in case of any accident, but never run an engine any distance. The distance within which a detached pony engine can be stopped depends upon the speed and the nature of the day. In a greasy day it will slide along twenty or thirty feet. On a good day, going at the rate of five miles an hour it can be stopped at forty feet; may possibly be brought to a dead stand in half that distance. It is according to the weight of the locomotive and the amount of steam on. In my opinion it would take about forty feet on a curve, and about fifty on a straight line, though it is possible it might be done quicker if the steam was shut off and reversed. The opening of the switch was about two hundred feet from the car that we hit. · The car that we wanted to get stood on track· seven, without any intervening car. On the occasion in question, I gave directions both to the engineer and the under yardsman; I sometimes tell one and sometimes both. It is generally enough to tell the under yardsman. The engineer and under yardsman were not together when I told them. It is the usual practice for the head yardsman to give his directions to the under yardsman, who then proceeds to do the work by the engine under his care. But if the under yardsman is not there, it was my duty to tell the engineer, and I sometimes, in the absence of the under yardsman went with the engine myself. The engineer has the entire control of the engine. Tell him what to do, and he is supposed to do it with safety. I never made any complaint to any officer of the company of Harris, for carelessness or incompetency."

Evidence was also given to show the previous incompetency and unfitness of Harris, which it is perhaps not necessary to state in full. That of James Donahue, related mainly to a prior accident, on which occasion some cars

were run into by Harris' engine, and a man engaged in coupling them was killed. The accident was in consequence of the misplacement of a switch, and nothing is stated to show that Harris was in fault. Peachey Malden, the freight agent, testified to the same occurrence, and that he reported the accident to the Superintendent. He also testified that on one occasion, the cab of Harris' engine was knocked off by coming in contact with a Michigan Southern train. The fault in this case he says, was with the Michigan Southern train. He also says that Harris was always looked upon as a competent and skilful engineer, and well able to manage his engine. The witness heard remarks at the time of these accidents which would probably be applied to any other engineer. These were from the parties around the yard, persons working on engines and laboring men, and were that Harris was careless. They might have used the word reckless. The witness could not say that he heard this on more than one occasion. On the occasion of this accident, the by-standers and others, in talking of the matter afterwards said he might be a little careless.

John Wilson testified for the plaintiff to the collision with the Michigan Southern train, putting the fault upon that train.

William Lewis gave evidence of remarks by hands in the yard, before the injury to plaintiff, that Harris was running too fast, and careless. This was somewhat qualified on cross examination, and he could not name any persons.

John Sullivan testified to having heard remarks by workmen in the yard that Harris had a pretty careless reputation, and they wished him out of the yard. The complaint appeared to be that he ran too fast. He never heard any remark of the kind made to any officer of the road, nor did the witness tell any officer.

We do not think there is anything in the evidence, from which the argument can legitimately be drawn that Harris was incompetent or unfit for his position, and that

the company were chargeable with notice of it, unless we find it in that the substance and effect of which is above set forth.

Under this evidence the Court charged the jury as requested by defendants:

1. That there is no evidence in the case to show want of care or good faith on the part of the company in the selection of Harris for his position.

2. That, if it is claimed that Harris fell into habitual carelessness after he was employed, there is no evidence that knowledge of such fact was brought home to the officers of the company, or that the company continued him in employment after such knowledge.

3. That as the plaintiff testifies that Harris was working with the plaintiff and under his general direction as head yardsman, from July 16 to November 22, this gave the plaintiff full opportunity to know if Harris were habitually careless, and as plaintiff testified that he made no complaint whatever to the officers of the company, the plaintiff cannot recover in this case.

4. That there is no evidence in the case to show that the casual remarks made by unknown persons, testified to by Lewis and Sullivan, ever reached the knowledge of any officer of the company, and this evidence is to be excluded from the case. And the Judge added to this the remark, that he was not aware of any evidence of reputation in the case, of a nature that would be notice to the company, and he refused to charge the jury that if they should find that the reputation of Harris was bad as an engineer, this was notice to the defendant.

These charges and refusal to charge obviously took the case away from the jury, and the question which the record now presents is, whether there was any evidence before the jury legitimately tending to prove the plaintiff's case, and upon which he was entitled as of right to their verdict.

We are constrained to say that after a careful examination of the case we find no such evidence.

It is not very clear that the plaintiff's evidence tended to establish a case of incompetency or unfitness on the part of Harris. If it be conceded that the injury to the plaintiff resulted from the want of due care and prudence on the part of the engineer, it by no means follows that previously he had given evidence that he was an unsuitable person for that responsible position. To give the testimony upon that point the best possible construction for the plaintiff, it falls short of making out a satisfactory case. It is not clear that it was of a character which would have justified a verdict for the plaintiff, had that been the sole question involved. But conceding that there was evidence upon that point for the consideration of the jury, we are next to see, whether, if incompetency existed at all, the defendants had such notice of that fact, either expressed or implied, as to put them in fault for continuing him in their employ.

It is not claimed that Harris lacked skill, or that he ever exhibited recklessness, or a want of due care previous to his employment by the defendants. They were not, therefore, chargeable with negligence in taking him into their service. If he was careless or untrustworthy, he became so after his engagement, and we have a right to presume they made all proper enquiries, and investigations at the time of employing him. The burden of proof, if the contrary were charged, would be upon the plaintiff.— *Wright v. N. Y. Central R. R. Co., 25 N. Y., 566; Gilman v. Eastern R. R. Corp., 10 Allen, 239;* and in this case he has not undertaken to establish it. We cannot infer a breach of duty on the part of defendants, when no evidence has been given from which the inference is legitimate.

Nor is it asserted in this case that any actual notice of the carelessness or other unfitness of Harris is shown to have ever been given to any of the officers of the railroad

company. The notice, if any, which is to bind them, is a notice which we must imply from the general reputation of this person, and from the fact that they are supposed to know the accidents occurring to their cars and engines and to enquire into and fully inform themselves concerning their causes. If the defendants continue a man in their employ who is so notoriously unfit, as to have established a general reputation to that effect, it is unreasonable, the plaintiff argues, to suppose the officers of the defendants ignorant of that fact, unless we excuse their want of information on the ground of neglect of duty on their part, to their employees and the public so gross as to make it proper and just to hold them responsible to the same extent as if they were fully informed of all the facts. And if they fail to inquire into the cause of accidents where manifestly this is an important part of their duty, and a high obligation rests upon them to accomplish it thoroughly and faithfully, they cannot afterwards justly plead their ignorance to excuse their principal from responsibility for other accidents resulting from the same cause.

It is plain, however, that Harris is not shown to have a general reputation for carelessness or unfitness of any description. No one ventures to express an opinion to that effect. The evidence only tends to show that when an accident occurred, remarks were made that he was careless, or that he went too fast. They were such remarks, we suppose, as were almost certain to be made in any case, when an unfortunate accident occurs, while the consequences are exciting the by-standers, and before enquiry and calm consideration has determined ·whether there is any basis for them in justice or not. Such remarks are of very trifling importance, and if they would tend to convict a man of negligence, few engineers of much experience, we apprehend, would escape condemnation. And of how little importance they were in the present case, and how little likely to express settled opinions, may be inferred from that fact, that

no one of the persons supposed to have made these remarks is placed upon the stand to testify to facts which would justify them. We think, therefore, that the evidence of reputation should be dismissed from further consideration.

It will not be inferred from what we have said, that we should hold that evidence of a general reputation, such as was sought to be proved in this case, would be inadmissible. From the language employed in some cases it might be supposed that the notice of unfitness, which was to charge the employer, must be nothing else than actual notice; but we are not disposed to question in the least the correctness of the doctrine advanced in the case of *Gilman v. Eastern R. R. Corporation, 10 Allen, 233*, and which put upon the employer the responsibility of negligently employing an unfit person, generally known and reputed to be such, notwithstanding the employer may in fact have been ignorant of such unfitness. The ignorance itself is negligence in a case in which any proper enquiry would have obtained the necessary information, and where the duty to enquire was plainly imperative. See *Wright v. N. Y. Central R. R. Co., 25 N. Y., 566.*

Coming now to the specific acts of negligence charged upon Harris previous to the accident in question, we may consider whether these were, actually or by implication, brought home to the knowledge of the officers of defendants in such manner and under such circumstances as to fairly make them responsible. And upon this question it is important to consider the relative position of Harris and the plaintiff, and the supervision which the latter had over the former in the discharge of his duties. This case differs from many which have been reported, in that in the case at bar, the party complaining of injury was not a servant subordinate to the one whose negligence caused it, but the reverse. He may not have been vested with any special authority over Harris, but to a certain extent he had the power to control his actions, and he probably had oppor-

tunity to observe and be informed of his habits and conduct, in his employment as full and complete as was possessed by any other person. The question then arises, if Harris was notoriously negligent and unfit, or if even at times he was inclined to be careless, was not the plaintiff, by virtue of his position, chargeable with the duty to the defendants and the public, to inform his superiors of a negligence which constantly threatened disaster to the interests of defendants, and which might prove destructive to the lives and property of others? And if with knowledge of the recklessness of Harris, the plaintiff continued in the employ of the defendants without complaint, did he not take upon himself all risk of injury from such recklessness, while in the ordinary performance of the services he had undertaken, as much so as if he had expressly contracted with reference to possible injury from such unfitness? We think both these questions must be answered in the affirmative.

It cannot be claimed that the officers of the company were chargeable with constructive notice of the unfitness of Harris, and the plaintiff not. The same facts which it is claimed they ought to have heard about, must have transpired in his immediate presence, or at least within the limited space within which he was constantly employed, and in view of those with whom he was constantly associated. All the reasons which charge the officers with knowledge apply with more force to a person situated as he was, in a position intermediate the persons who would be likely to complain and the officers. The probability that he was fully informed is greater than that they were, and if they were guilty of negligence in not discharging Harris, we think the plaintiff was guilty of at least equal negligence in not complaining of him.

The rule on this subject, as we understand it, is very well laid down in *Mad River & Lake Erie R. R. Co. v. Barber*, *5 Ohio N. S., 564.* The action was brought to re-

cover damages for an injury caused to Barber by reason of defects in some portion of the machinery employed by the railroad company while he was in their employ as conductor. The Court say: " The duty imposed on the company by the relation occupied by the conductor was to use reasonable and ordinary care and diligence in furnishing him with sufficient, sound and safe cars and machinery for the train. This duty required not only that the company should use proper skill and diligence in procuring and furnishing sufficient and safe cars and machinery, but, also, when notified that they had become insufficient, and unsafe, or when they had been in use as long as they could in safety be used, to take them off the road until repaired and made sufficient and safe. And for any injury sustained by an agent or employee of the company, from any neglect of this duty, the company would be liable. *But the relation occupied by the agent or employee imposes the reciprocal duty upon him.* It was the duty of Barber, as the agent or conductor of this train, to use ordinary and reasonable skill and diligence on his part, not simply in the management of the train, but also in supervising the due inspection of the cars, machinery and apparatus, as to their sufficiency and safety, while under his charge, and on the discovery of any defect or insufficiency, to notify the company, and to take the proper precautions to guard against damages therefrom. And if he was injured by the negligence of the company in furnishing, or continuing to use defective cars and machinery, yet if his own neglect of duty in the management of the train, or due inspection of the cars and machinery in his charge, contributed as a proximate cause of the injury, he could have no right of action against the company for damages; or if he knew of the defects and insufficiency of the cars or machinery, and without taking the necessary and proper precaution to guard against danger, continued to use them, he took upon himself this risk, and waived his right as

against the company." We think this is good law and good sense, and it is fatal to any recovery by the plaintiff in this case.

In the case of the *Indianapolis & Cincinnati R. R. Co., v. Love, 10 Ind., 556,* the Court say that where both parties have equal knowledge, and the servant continues in the service, the true rule of decision is, that each party takes the risk, unless the employer undertakes to give special directions. The same rule was recognized in the case of *Thayer v. St. Louis, Alton & T. H. R. R. Co., 22 Ind. 29,* and in numerous other cases which we need not quote from here. The case of *Skipp v. Eastern Counties R. Co., 9 Exch., 223; Griffiths v. Gidlow 3 H. & Nor., 654; Williams v. Clough, Ibid, 258; Assop v. Yates, 2 H. & Nor., 768; Hayden v. Smithville Manf. Co., 29 Conn., 558;* and *McMillan v. Saratoga & Wash. R. R. Co., 20 Barb., 449,* are particularly referred to.

It is sought, however, to bring this case within the principle indicated in *Indianapolis &c., R. R. Co., v. Love, 10 Ind., 556,* and others like it, by showing that in fact in this case the defendants, through the plaintiff's superior officer, Mr. Malden, did give special directions and subjected the plaintiff to special risk by ordering him in this instance to take the pony engine and perform the duty, in attempting to discharge which, the accident occurred. But there is no foundation for this argument. What the plaintiff was directed to do was only an ordinary service, such as the employment contemplated, and such as he was performing from hour to hour. It was not something apart from his ordinary occupation, under his employment, and which for that reason he could not be supposed to have contemplated the risk of, nor was the direction to perform it "special direction" in the sense of pointing out anything unusual to be done by him. It would be as proper to say of any order to a conductor to perform his usual trip, that it was special

direction, as it would be to apply that language to the present case.

This view of the case, renders it unnecessary to consider some other questions which are presented by the assignment of errors, and which become immaterial if the plaintiff on his own showing was not entitled to recover. Obviously, the case is to be regarded in a light somewhat different from what it should have been, had the evidence which the plaintiff gave been given by other witnesses. In the latter case the evidence of facts, precluding recovery, would be addressed to a jury who might not give them full credence, or who might suppose them qualified by other evidence considerably modifying their legal effect. But the plaintiff who state his own case on the witness stand, and states himself out of court, cannot well ask the jury to disbelieve or disregard that which tells against him. If he unequivocally states facts which establish a defense, and there is no attempt at a qualifying explanation by other witnesses, he has no ground of complaint if the Court charges the jury that no recovery is justifiable.

The judgment of the Circuit Court must be affirmed with costs.

The other Justices concurred.